NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| KNIGHTS FRANCHISE SYSTEMS, INC., a Delaware Corporation, | ) ) ) | Hon. Garrett E. Brown, Jr. |
| Plaintiff, | ) ) ) | Civ. No. 06-5243 |
| v. | ) ) ) | **MEMORANDUM OPINION** |
| P.C.P.S. CORP., a Mississippi Corporation d/b/a KNIGHTS INN, and BHARTI PATEL, an individual, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |
| P.C.P.S. CORP. d/b/a KNIGHTS INN and BHARTI PATEL, | ) ) ) |  |
| Counterclaim Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| KNIGHTS FRANCHISE SYSTEMS, INC., | ) ) |  |
| Counterclaim Defendant. | ) ) |  |

Bryan Paul Couch, Esq.
CONNELL FOLEY, LLP
85 Livingston Avenue
Roseland, New Jersey 07608
*Attorneys for Plaintiff / Counterclaim Defendant*

Joel D. Rosen, Esq.
ROSEN PAGAN, LLC
3490 U.S. Route 1
Building 11
Princeton, New Jersey 08543
*Attorneys for Defendants / Counterclaim Plaintiffs*

**BROWN**, Chief Judge:

This matter comes before the Court upon Plaintiff Knights Franchise Systems, Inc.'s (KFS) motion (Doc. No. 36) for summary judgment on Counts II, IV, and VI of the Amended Complaint (Doc. No. 27).[1]  KFS also seeks the dismissal of Defendants' Second Amended Counterclaim (Doc. No. 28).  For the following reasons, the Court will grant Plaintiff's motion with respect to Counts II, IV, and VI of the Amended Complaint and grant Plaintiff's motion with respect to Defendants' counterclaims.

## I.   BACKGROUND

This litigation involves claims and counterclaims arising from a contentious guest-lodging franchise relationship.  Defendant P.C.P.S. Corp. (P.C.P.S.) entered into a 15-year Franchise Agreement with KFS on May 3, 2001, that permitted P.C.P.S. to operate an 82-room guest-lodging facility in Hattiesburg, Mississippi (hereinafter "the Facility") as a Knights® franchise.  (Workman Aff., Ex. A ("Franchise Agreement").)  As consideration for the Franchise Agreement, Defendant Bharti Patel, the president of P.C.P.S. and co-owner of the Facility, executed a guaranty of P.C.P.S.'s obligations under the Franchise Agreement.  (Workman Aff., Ex. B ("Guaranty").)  Among other things, the Franchise Agreement required P.C.P.S. to maintain accurate financial records and report gross room revenues to KFS, pass quality assurance inspections by KFS, maintain minimum insurance, and pay monthly recurring fees[2] to

---

[1]By Order of August 10, 2009, this case was reassigned to the undersigned.

[2]The recurring fees required by the Franchise Agreement generally consisted of monthly royalty and system assessment fees of 4.5% and 3% of gross room revenues, respectively (Franchise Agreement § 7.1.1, 7.1.2, Schedule C), but permitted new franchisees to pay a lesser "Combined Rate" ranging between 5.5% and 6.5% of gross room revenues for the first four years

KFS.  (*See* Franchise Agreement §§ 3.8, 3.9, 3.10, 7.)  Interest would accrue on overdue sums at 1.5% per month until the amount had been paid.  (*Id.* § 7.3.)  Section 11.2 of the Franchise Agreement permitted KFS to terminate the Franchise Agreement after notice to P.C.P.S. for, *inter alia*, failure to pay any amount due to KFS under the Franchise Agreement and/or failure to operate the Facility as a "Knights Inn."  (*Id.* § 11.2; *see id.* § 11.1.)  Upon termination, the Franchise Agreement provided that P.C.P.S. would pay liquidated damages in the amount of $500 per operational guest room at the time of termination.  (*See id.* at §§ 12.1, 18.5.)

      According to KFS, P.C.P.S. stopped making payments for recurring fees in or about May 2002, prompting KFS to send numerous notices of default to Defendants.  (Workman Aff. ¶ 29 & Ex. C.)  Although the parties agreed to a repayment plan on September 9, 2005, P.C.P.S.'s failure to cure "persistent monetary defaults" prompted KFS to send a notice of termination on April 11, 2008, noting that the termination would be effective June 11, 2008.  (*Id.* ¶¶ 34, 37 & Ex. H; *see also* Am. Compl. Exs. C–E (default letters from July and October 2007 and February 2008 notifying P.C.P.S. of its failure to pay recurring fees).)  By letter of May 12, 2008, KFS revised the effective termination date of the previous letter to July 11, 2008, indicating that the prior letter's date was a clerical error.  (*Id.* ¶ 38 & Ex. I.)  It is undisputed that P.C.P.S. ceased operating as a Knights Inn prior to the July 11, 2008 effective date of the termination.  (O'Hara Aff., Ex. D (July 10, 2008 letter from Defendants' counsel indicating that P.C.P.S. had stopped running the Facility as a Knights Inn)[3]; *see also* Workman Aff. ¶¶ 39–40 & Ex. J.)  On

---

(*see id.* § 18.3).

    [3]Defendants argue that this Court should not consider the July 10, 2008 letter from their counsel because it is inadmissible hearsay.  The Court is surprised by Defendants' position, because Defendants also rely on this document in support of their arguments.  (*See* Defs.' Br. at

September 5, 2008, Plaintiff filed a six-count Amended Complaint seeking, *inter alia*, recurring fees and liquidated damages owed under the Franchise Agreement and Guaranty.

Not surprisingly, Defendants present a vastly different account of the parties' contractual relationship. Defendants maintain that KFS breached the Franchise Agreement first by failing to provide a reservation terminal and software that would enable the Facility to participate in the Knights Inn Central Reservations System (CRS), a remote reservation-processing system required by the Franchise Agreement. (*See* Defs.' Br. at 7–9.) In support of this allegation, Defendants provide a copy of the $4,000 check they claim to have paid for the computer and software. (Rosen Aff., Ex. C (check dated October 15, 2001).) Defendants also allege that KFS's quality assurance inspectors gave failing grades to the Facility in bad faith in an effort to end the Franchise Agreement prematurely. (*See* Defs.' Br. at 11–12.)

On September 5, 2008, Defendants filed a two-count Second Amended Counterclaim that presented multiple claims for relief arising under contract and tort law. Although Defendants' claims are not entirely clear, the Court understands Defendants to allege the following: (1) that KFS breached the Franchise Agreement by failing to provide the CRS terminal, reservations via CRS, marketing, and training; (2) that KFS breached the implied covenant of good faith and fair dealing in its performance under the Franchise Agreement; (3) that KFS intentionally interfered with Defendants' business and reputation; (4) that KFS conspired with Ramada and Cendant, non-party corporations, to deprive Defendants of the benefits of a settlement bargain made in another lawsuit; and (5) that KFS gave insufficient notice of termination under Mississippi law.

---

6, 21.) In any event, Defendants' argument lacks merit because the letter is an admission of a party-opponent, *see* Fed. R. Evid. 801(d)(2), it has been identified by sworn affidavit, and its authenticity has not been questioned.

(*See* Second Am. Counterclaims Counts I–II.)  Defendants' Amended Answer of March 24, 2009, presented roughly the same allegations as affirmative defenses to Plaintiff's claims.  (*See* Am. Answer, Affirmative Defenses ¶¶ 1–10.)

Plaintiff now moves for summary judgment on Counts II, IV, and VI of the Amended Complaint, seeking $41,000 in liquidated damages for termination of the franchise pursuant to § 12.1 of the Franchise Agreement (Count II), $272,965.38 in unpaid recurring fees and related interest (Count IV), and a judgment holding Patel personally liable for these amounts pursuant to the Guaranty (Count VI).  For each of these counts, KFS also seeks prejudgment interest, reasonable attorneys' fees, and costs, as provided by the Franchise Agreement.  In addition, KFS seeks dismissal of Defendants' counterclaims, arguing that Defendants' counterclaims lack legal merit and factual substantiation.  Defendants contend that this Court should deny summary judgment because Plaintiff's earlier-occurring breach excused their performance under the Franchise Agreement.

## II.     ANALYSIS

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no triable issue exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist,

the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this matter involves diverse parties[4] and the amount in controversy exceeds $75,000.

  *A. Franchise Agreement*

P.C.P.S. does not deny that it breached its contractual obligation to pay recurring fees. Indeed, the President of P.C.P.S. testified during her deposition that she sent the last payment for recurring fees in August or September of 2005. (O'Hara Aff., Ex. B ("Patel Dep.") at 28:9–25, 35:19–24.) Further, it is undisputed that Defendants stopped operating as a Knights Inn prior to the July 11, 2008 effective date of the termination. (O'Hara Aff., Ex. D; *see also* Workman Aff. ¶¶ 39–40 & Ex. J.) Thus, the only matter for the Court to determine is whether any of Defendants' affirmative defenses, presumed to be true, excuse Defendants from performing under the Franchise Agreement. This Court concludes they do not.

It is axiomatic that when a party believes another contacting party has breached its contractual obligations, the injured party may either terminate the contract or continue to perform and sue for damages, but if the injured party continues to perform under the contract, it may only sue for damages caused by the breach, but it may no longer rely on that breach to excuse its own subsequent failure to perform contractual obligations. *Frank Stamato & Co. v. Borough of Lodi*,

---

[4] It is undisputed that KFS is a Delaware corporation with a principal place of business in New Jersey and that Defendants are citizens of Mississippi. (*See* Am. Compl. ¶¶ 1–3; Am. Answer ¶¶ 1–3.)

4 N.J. 14, 21 (1950) (citing 5 Williston on Contracts (Rev. Ed.) 3749); *see also S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992) (recognizing that "the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages," but that "[u]nder no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits").  In the context of a franchise agreement, this principle has been held to bar the franchisee from raising affirmative defenses on the basis of the franchisor's unlawful discrimination amongst franchises, tortious interference with the franchise's business and reputation, and breach of the franchise agreement. *McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F. Supp. 401, 403 (W.D.N.Y. 1986); *accord Travelodge Hotels, Inc. v. Elkins Motel Assocs., Inc.*, No. 03-799, 2005 WL 2656676, at *7 (D.N.J. October 18, 2005).

Presuming Defendants' affirmative defenses to be true, it is clear that Defendants continued to receive the benefit of the Franchise Agreement—operating the Facility as a Knights Inn—for nearly seven years after KFS's purported failure, beginning in October 2001, to furnish equipment and service that Defendants claim they were owed under the Franchise Agreement.  Defendants cannot now excuse their continuing non-payment of recurring fees on the basis of KFS's alleged breach of the Franchise Agreement or its alleged tortious interference with their business.  "The alleged wrongs of plaintiff do not constitute affirmative defenses to defendants' non-payment of franchise fees." *McDonald's Corp.*, 653 F. Supp. at 403.

No question of material fact remains with regard to liability.  Section 7 of the Franchise Agreement required P.C.P.S. to pay monthly recurring fees, and Defendants admit that they did not satisfy this contractual obligation.  The Guaranty provided that Ms. Patel would

"immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of the Franchisee under the [Franchise] Agreement." Accordingly, the Court will grant summary judgment in favor of KFS with respect to liability on Counts II, IV, and VI of the Amended Complaint. Defendants will be jointly liable for the damages assessed below.

   B. *Damages*

KFS seeks $272,965.38 in unpaid recurring fees and related interest and $41,000 in liquidated damages owed under the Franchise Agreement, as well as prejudgment interest, reasonable attorneys' fees, and costs. Defendants only contest Plaintiff's calculation of damages with regard to recurring fees, arguing (I) that KFS's figure fails to account for payments made by Defendants, and (ii) that KFS improperly relied upon estimated gross room revenues for 2006 and 2007, during which time Defendants provided actual room revenues.

Although Defendants have not produced documentation of the gross room revenues they claim to have provided KFS during this time frame,[5] Defendants do present evidence of payments they made to KFS between April 2001 and September 2005 totaling $38,985.72. (*See* Rosen Aff., Ex. N (bank statement of checks paid).) KFS responds that all credits to Defendants' account are reflected in the Cash Application Report submitted as Exhibit D to the Affidavit of KFS Vice President Valerie Capers Workman. After careful review of the Cash Application Report, the Court notes that check numbers 876, 929, and 2566, in the combined total amount of $25,000, have been credited to Defendants' account, and that these sums do not appear in

---

[5] Ms. Patel testified during her deposition that she provided gross room revenue reports to KFS through the end of 2007, and that she kept records of these reports, which would be provided to Plaintiff. (*See* Patel Dep. at 42–43.) No such reports may be found in the record.

Plaintiff's itemized account of recurring fees owed. (*Compare* Workman Aff., Exs. D *and* K *with* Rosen Aff., Ex. N.) Furthermore, the Court notes that all but one of the payments presented by Defendants predate the first billed expense—a charge of $13.84 for July 2002—that appears on Plaintiff's itemized account of recurring fees owed. (*See* Workman Aff., Ex. K.) Thus, the only payment ostensibly in dispute is the $650 payment made by Plaintiff via check number 173 (*see* Rosen Aff., Ex. N), but it is evident from Plaintiff's itemized account of recurring fees owed that this sum has not been charged against Defendants' account (*see* Workman Aff., Ex. K at 2–3 (containing monthly fees owed for 2002 and 2003, none of which exceed $300)). Absent evidence of payments made but not credited, no genuine issue of fact remains with regard to the amount of recurring fees owed under the Franchise Agreement.

The Court has carefully reviewed Plaintiff's itemized account of recurring fees owed and finds the use of estimated gross room revenues[6] for October 2006 through July 2008 to be reasonable in the absence of actual gross room revenues. KFS is entitled to $272,965.38 in unpaid recurring fees and related interest under the Franchise Agreement. Pursuant to § 7.3 of the Franchise Agreement, KFS is entitled to $28,537.32 ($134.61 per day x 212 days) in prejudgment interest accruing from March 23, 2009 (the date of the itemized account of recurring fees owed) until today.[7]

---

[6] KFS based its estimated royalties on the "system-wide average revenue earned by KFS on a per-room annual basis." (Workman Aff. ¶ 45.) The Court notes that, for the most part, the estimated royalties charged by KFS are commensurate to, if not less than, actual royalties charged in 2005 and 2006. (*See* Workman Aff., Ex. K at 6–17.)

[7] The daily interest rates utilized by the Court reflect the 1.5% monthly interest provided by § 7.3 of the Franchise Agreement, as applied to principal amounts owed under the Franchise Agreement.

With regard to KFS's request for liquidated damages, courts will enforce liquidated damages provisions when (1) the damages sustained by the non-breaching party would be difficult to ascertain, and (2) the amount provided for in the liquidated damages clause is a reasonable forecast of those damages. *See Wasserman's Inc. v. Twp. of Middletown*, 137 N.J. 238, 249–55 (1994). Liquidated damages provisions "should be deemed presumptively reasonable and . . . the party challenging such a clause should bear the burden of proving its unreasonableness." *Id.* at 252 (citations omitted). Here, Defendants do not argue that the liquidated damages sought by KFS are unreasonable, and the Court is satisfied that the liquidated damages provision, which assesses damages as $500 per guest room authorized to operate at the time of the termination (Franchise Agreement § 18.5), provides a reasonable forecast of future lost recurring fees that would otherwise be nearly impossible to predict. Defendants do not dispute that the Facility had 82 rooms authorized for use. Accordingly, KFS is entitled to $41,000 ($500 x 82 rooms) in liquidated damages. Pursuant to § 7.3 of the Franchise Agreement, KFS is entitled to $8,997.90 in prejudgment interest on this amount ($20.22 per day x 445 days) accruing from 30 days after the termination (August 2, 2008) until today. (*See* Franchise Agreement § 12.1 (allowing a 30-day grace period for payment of liquidated damages).)[8]

Finally, with regard to reasonable attorneys' fees and costs, both the Franchise Agreement and Guaranty provide for recovery of these expenses by the prevailing party. By virtue of this Court's ruling today, KFS is a prevailing party, and the Court will grant reasonable attorneys'

---

[8]In light of today's ruling, which awards damages under the Franchise Agreement and Guaranty, the Court anticipates that Plaintiff will withdraw Counts I, III, and V of the Amended Complaint, which present alternative theories requesting the same damages.

fees and costs.  KFS shall submit descriptive time entries from its billing records and other documentation supporting its request for reasonable attorneys' fees and costs within 30 days of receipt of the accompanying Order.  Defendants will have 21 days to submit any objections to the reasonableness of KFS's attorneys' fees and costs.  The Court will issue a final judgment to include reasonable attorneys' fees and costs in due course.

     *C.  Counterclaims*

As Plaintiff properly recognizes, this Court's rejection of Defendants' affirmative defenses does not automatically dispose of Defendants' counterclaims.  Although Plaintiff's motion requests the "dismissal" of Defendants' counterclaims, in light of the extra-pleading materials relied on by both sides of this dispute, and considering that the parties have had ample opportunity for discovery (*see* Scheduling Order of Feb. 29, 2008, Doc. No. 22 (providing a discovery deadline of April 3, 2008)), the Court will apply the summary judgment standard to this portion of Plaintiff's motion.  *See* Fed. R. Civ. Pro. 12(d).  Thus, the Court must assess whether Plaintiff has shown that Defendants failed to present evidence substantiating their counterclaims.  *See Celotex*, 477 U.S. at 325 ("[T]he burden on the [party moving for summary judgment] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").  This task is complicated by the fact that Defendants' counterclaims lump numerous and seemingly unrelated theories of relief into two vaguely defined "counts," as well as Defendants' utter lack of any response to Plaintiff's request for the dismissal of the counterclaims.  Nevertheless, the Court must endeavor to decipher Defendants' arguments and the merit of Defendants' claims from the record and Defendants' arguments on behalf of their affirmative defenses.

11

The Court discerns five primary theories from Defendants' two identified counterclaims: (1) that KFS breached the Franchise Agreement by failing to provide the CRS terminal, reservations via CRS, marketing, and training; (2) that KFS breached the implied covenant of good faith and fair dealing in its performance under the Franchise Agreement; (3) that KFS intentionally interfered with Defendants' business and reputation; (4) that KFS conspired with Ramada and Cendant, non-party corporations, to deprive Defendants of the benefits of a settlement bargain made in another lawsuit; and (5) that KFS gave insufficient notice of termination under Mississippi law. (*See* Second Am. Counterclaims Counts I–II.) The Court will address each in turn.

*1. Breach of the Franchise Agreement*

With regard to Defendants' allegation that KFS breached various obligations arising under the Franchise Agreement, the Court agrees with KFS that this theory of counterclaim lacks merit. Defendants assert that KFS failed to satisfy the following requirements of the Franchise Agreement: provision of a CRS terminal, remote booking of reservations via CRS, pre-opening training for staff working at the Facility, and marketing support. None of these alleged omissions demonstrate a breach of the Franchise Agreement.

Beginning with the matter of the CRS-accessible computer, although Defendants present evidence that they paid $4,000 to KFS (*see* Rosen Aff., Ex. C (check number 0596 bearing memo "Data Pack"))—ostensibly for the purpose of procuring the reservations terminal and software to link into the CRS—this arrangement does not have a basis in the Franchise Agreement. Indeed, § 3.6 of the Franchise Agreement expressly states that P.C.P.S. was obligated "to obtain and maintain the computer and communications service and equipment

[KFS] specif[ied] to participate in [CRS]." By contrast, § 4.2, the portion of the Franchise Agreement ostensibly relied upon by Defendants, only obligates KFS to "operate and maintain . . . a computerized Reservation System"[9] and to "provide software maintenance for the software [that KFS] license[s] [to P.C.P.S.]" (Franchise Agreement § 4.2.) Consequently, Defendants cannot support their claim that KFS breached the Franchise Agreement by submitting evidence that *they* performed pursuant to a purported collateral agreement relating to the purchase of a computer.

Turning to Defendants' reservation-booking theory, Defendants do not dispute that KFS timely enrolled their Facility in CRS (*see* Workman Aff. ¶¶ 31–32 & Ex. E), or that § 11.4 of the Franchise Agreement permitted KFS to suspend their participation in CRS for their admitted nonpayment of recurring fees. Moreover, Defendants do not suggest that KFS failed to maintain or operate CRS—an off-site reservations-booking system that KFS utilizes to route business to its franchises—or that the Franchise Agreement guaranteed a certain number of monthly reservations via CRS. Thus, to the extent that Defendants premise breach of the Franchise Agreement upon KFS's purported failure to provide a reservations terminal, the Franchise Agreement does not support this claim, and to the extent that Defendants premise the breach on KFS's failure to book reservations via CRS, Defendants have failed to identify a time when KFS suspended their access to CRS without express authorization under the Franchise Agreement.

Turning next to Defendants' lack-of-training theory, the only evidence Defendants

---

[9]Section 4.2's reference to a "computerized Reservation System" clearly does not refer to an obligation for KFS to deliver a computer terminal to the Facility, both because § 3.6 obligates P.C.P.S. "to obtain and maintain the computer and communications service and equipment" and because § 4.2 explains that Defendants' "Facility w[ould] participate in the Reservation System," suggesting that CRS would be an autonomous entity under the control of KFS.

present to support the contention that KFS failed to provide pre-opening training comes from the deposition testimony of Henry Coffiel, P.C.P.S.'s head of security.  When asked to identify how KFS breached the Franchise Agreement, Mr. Coffiel testified that KFS failed to conduct pre-opening inspections and provide training.  (*See* O'Hara Aff., Ex. A at 97–100.)  Indeed, § 4.1.2 of the Franchise Agreement obligated KFS to provide a "property opening training program."  Yet, presuming the truth of Mr. Coffiel's vague claim that the inspections and training "never materialized" (*id.* at 100:3), Defendants have not suggested that they incurred any damages as a result of this purported breach.  This unsupported and vague testimonial allegation is "not significantly probative," and in the absence of damages stemming from this alleged omission, the Court finds no genuine issue of material fact in this regard.  *See Peterson v. AT&T*, No. 99-4982, 2004 WL 190295, at *3 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249).

Finally, with regard to marketing support, Defendants have not identified an obligation under the Franchise Agreement that KFS has breached.

For these reasons, the Court will grant summary judgment in favor of KFS on Defendants' theory that KFS breached the Franchise Agreement by failing to provide a computer terminal, CRS reservations, pre-opening training, and marketing support.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

With regard to the covenant of good faith and fair dealing, Defendants correctly note that New Jersey law treats breaches of this implied covenant as distinct from claims for breach of contract.  *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001) ("[A] party's performance under a contract may breach th[e] implied covenant [of good faith and fair dealing] even though that performance does not violate a pertinent express term [of the contract].").  However, to

14

support the implied covenant claim, Defendants must still present evidence that KFS acted in bad faith or with bad motive. *See id.* at 251 ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.") (citations omitted). Defendants have not identified how KFS breached the implied covenant of good faith and fair dealing, ostensibly basing their argument on nothing more than conclusory assertions that KFS representatives gave pretextual reasons for issuing the Facility failing scores during quality assurance inspections. Defendants may genuinely believe that KFS has acted with bad faith, but mere belief, without more, does not present a genuine issue of fact. The Court will grant summary judgment in favor of KFS on Defendants' theory that KFS breached the implied covenant of good faith and fair dealing.

### 3. *Tortious Interference with Defendants' Business and Reputation*

The Court agrees with Plaintiff that Defendants' interference theory must fail because Defendants have presented no evidence supporting this allegation. In order to present a claim of tortious interference under New Jersey law, Defendants must present facts demonstrating (i) Defendants' reasonable expectation of economic advantage, (ii) that KFS acted intentionally and without excuse, (iii) that there was a reasonable probability that Defendants would have received the anticipated economic benefits in the absence of KFS's actions, and (iv) that KFS's actions resulted in damages. *See Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751–52 (1989) (citations omitted). So far as the Court can tell, the sole interference of which Defendants complain comes from KFS's alleged failure to provide remote reservations from CRS, though Defendants also contend that KFS improperly booked reservations in the aftermath of Hurricane Katrina in September 2005 and after the termination notice.

Beyond the irony that Defendants simultaneously complain of too many and too few reservations, it is clear that KFS acted within the authority provided by the Franchise Agreement when, in August 2002, it suspended Defendants from the CRS system as a penalty for Defendants' non-payment of recurring fees. (Workman Aff. ¶ 33; *see* Franchise Agreement § 11.4 (permitting suspension from CRS for any default).) Further, it appears that KFS reinstituted the suspension after Hurricane Katrina at *Defendants'* request. (*See* Workman Aff. ¶ 35 & Ex. F.) In any event, although Defendants generally allege that KFS booked reservations at outdated prices, they have not substantiated this allegation with any evidence of damages. Thus, not only were KFS's actions authorized by the Franchise Agreement, but Defendants have failed to present evidence of damages. Therefore, this Court will grant summary judgment in favor of KFS on Defendants' theory that KFS tortiously interfered with Defendants' business and reputation.

*4. Conspiracy to Deprive Defendants of the Benefits of Settlement*

With regard to their allegation that KFS conspired with Ramada and Cendant, non-party corporations, "to deprive [D]efendants of the benefit of the settlement bargain which they made in [a collateral] lawsuit" (Defs.' Second Am. Counterclaim), Defendants have presented no evidence of the settlement agreement to which they allude, let alone evidence that KFS conspired to deprive Defendants of the purported agreement's benefit. Instead, Defendants rely on conclusory assertions that KFS's parent corporation induced them to accept what they perceived to be a less-marketable Knights Inn franchise as part of the settlement of a collateral lawsuit. (*See* Defs.' Br. at 10–11.) As noted above, although Defendants may genuinely believe that KFS conspired to deprive them of their preferred franchise, mere belief does not create a genuine issue

of fact. Furthermore, to the extent that Defendants allege that KFS and non-party entities conspired to interfere with Defendants' business and reputation, this theory of counterclaim lacks merit for the same reasons the Court identified with regard to Defendants' tortious interference theory of counterclaim. For these reasons, the Court will grant summary judgment in favor of KFS on Defendants' theory that KFS conspired to deprive them of a settlement bargain from a collateral lawsuit.

### 5. *Insufficient Notice of Termination*

Finally, with regard to Defendants' ostensible claim that KFS provided insufficient notice of termination under Mississippi law, this claim is foreclosed by § 17.6.1 of the Franchise Agreement, which states that New Jersey law governs disputes arising thereunder. Defendants do not allege that they received insufficient notice of termination under New Jersey law. Accordingly, the Court will grant summary judgment in favor of KFS on Defendants' theory that KFS gave insufficient notice of termination.

## III.  CONCLUSION

For the aforementioned reasons, the Court will grant Plaintiff's motion (Doc. No. 36) for summary judgment on Counts II, IV, and VI of the Amended Complaint with respect to liability, and award $272,965.38 in recurring fees, $41,000 in liquidated damages, and $37,535.22 in combined prejudgment interest. Defendants P.C.P.S. and Ms. Patel will be jointly liable for these damages. Plaintiff will have 30 days from receipt of the accompanying Order to submit descriptive time entries from its billing records and other documentation supporting its request for reasonable attorneys' fees and costs. Defendants will have 21 days to submit any objections to the reasonableness of KFS's attorneys' fees and costs. The Court will also grant summary

judgment in favor of KFS on Counts I and II of Defendants' Second Amended Counterclaim.  An appropriate form of order accompanies this Memorandum Opinion.

Dated: October 21, 2009

/s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.
